UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| KIMBERLY LYNN PIERCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 2:17-CV-125 |
| vs. | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the United States Magistrate Judge under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's Disability Insurance Benefits application under the Social Security Act was denied after a hearing before an Administrative Law Judge ("ALJ"). This action is for judicial review of the Commissioner's final decision per 42 U.S.C. § 405(g). Each party filed a dispositive motion [Docs. 16 & 19] with a supporting memorandum [Docs. 17 & 20].

## I.    APPLICABLE LAW – STANDARD OF REVIEW

A review of the Commissioner's findings is narrow. The Court is confined to determining (1) whether substantial evidence supported the factual findings of the ALJ and (2) whether the Commissioner conformed to the relevant legal standards. 42 U.S.C. § 405(g); *see Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989). "Substantial evidence" is evidence that is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact. *LeMaster v. Sec'y of Health & Human Servs.,* 802 F.2d 839, 841 (6th Cir. 1986). A Court may not try the case *de novo*, resolve conflicts

in the evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the Court were to resolve factual issues differently, the Commissioner's decision must stand if substantial evidence supports it. *Listenbee v. Sec'y of Health & Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). But, a decision supported by substantial evidence "will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007). The Court may consider any record evidence regardless of whether the ALJ cited it. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d. 528, 535 (6th Cir. 2001).

A claimant must be under a "disability" as defined by the Act to be eligible for benefits. "Disability" includes physical and mental impairments that are "medically determinable" and so severe as to prevent the claimant from (1) performing her past job and (2) engaging in "substantial gainful activity" available in the regional or national economies. 42 U.S.C. § 423(a).

A five-step sequential evaluation is used in disability determinations. 20 C.F.R. § 404.1520. Review ends with a dispositive finding at any step. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The complete review poses five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's [Residual Functional Capacity], can he or she perform his or her past relevant work?

5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4).

The claimant has the burden to establish an entitlement to benefits by proving the existence of a disability under 42 U.S.C. § 423(d)(1)(A).  *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994).  The Commissioner has the burden to establish the claimant's ability to work at step five. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## II.    RELEVANT FACTS AND PROCEDURAL OVERVIEW

### A.    Procedural History

In her application, Kimberly Lynn Pierce ("Pierce") alleged impairments she believed were disabling as of July 17, 2014 (Doc. 11, Transcript p. 11) (reference to "Tr" and the page denote the administrative record). Her claim was initially denied in May 2015 and upon reconsideration in September 2015 (*Id.*). The ALJ conducted a hearing on March 25, 2015; supplemental testimony was provided on June 26, 2015. Payne testified at each hearing and a vocational expert testified at the supplemental hearing (Tr. 28-43).

The ALJ utilized the five-step analysis in evaluating the claims and found several of Payne's alleged physical and mental impairments were severe. Ultimately, the ALJ made the dispositive finding that Payne was not disabled. The findings were as follows:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019;

2.    The claimant has not engaged in substantial gainful activity since July 17, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*);

3.    The claimant has the following severe impairments: degenerative disc disease with right hip pain; cardiac disease; anxiety; and depression (20 CFR 404.1520(c));

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526);

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as

defined in 20 CFR 404.1567(b) except standing and walking four hours, sitting six hours, occasionally kneeling, balancing, stooping, crouching, and crawling, and reaching overhead bilaterally, avoiding concentrated exposure to fumes and respiratory irritants, hazards and vibrations and climbing. The claimant can perform simple routine work tasks.

6. The claimant is capable of performing past relevant work as a clerk (Dictionary of Occupational Titles #205.367.062). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565);

7. The claimant has not been under a disability, as defined in the Social Security Act, since July 14, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-22).[1] The Appeals Council denied Plaintiff's review request (Tr. 1).

**B.     Evidence in the Record**

The Commissioner filed a Transcript that includes records from the disability proceedings, including medical records and opinions from treating sources, an examining consultant and state agency reviewers. Pierce's brief reviews the history, particularly the medical opinion evidence [Doc. 17]. The Commissioner's brief also reviews the record [Doc. 20].

**C.     Medical History**

Pierce maintains she has the severe impairments of back pain and right hip pain, heart problems, and depression and anxiety (Tr. 13, 33-37). A review of her medical history is necessary to the Court's analysis of the issues:

The earliest medical records in the transcript date from 2008. In May 2008, Pierce complained of low back pain for which she underwent a lumbar MRI (Tr. 260). In November 2008, she presented at the Lonesome Pine Hospital ER due to chest pain, anxiety and panic attacks (Tr. 265-68). The ER physician recommended Pierce follow-up with her primary care physician for stress test (Tr. 268). Whether she complied is indeterminate.

---

[1] A discussion follows many of the findings. Such discussion is not repeated here unless necessary.

In July 2010, Pierce returned to the Lonesome Pine Hospital ER (Tr. 235). She experienced numbness in her left leg while at work and, after becoming anxious about this symptom, she developed arm numbness and sharp, shooting chest pain that radiated into her arm (*Id.*). Pierce underwent an EKG with abnormal results and was admitted for observation (*Id.*). She was discharged the following day and a stress test was scheduled (Tr. 236).

Pierce returned to the ER with chest pain in January 2011 (Tr. 306). Acute chest pain was diagnosed and she was to continue her usual medications (Tr. 298, 306). On December 21, 2011, Pierce again sought ER care for radiating chest pain that caused burning sensations (Tr. 329). A chest x-ray showed no acute abnormality (Tr. 347).

On June 10, 2013, Pierce visited the Coeburn Hospital Clinic complaining of back pain (Tr. 513). The single page record contains a variety of check boxes and generally illegible notes. On July 24, 2013, Pierce presented to the Holston Valley Hospital ER complaining of neck pain on her left side that radiated down her arm. Cervical radiculopathy was diagnosed (Tr. 433-34). Pierce returned to the Coeburn clinic on September 9 and December 2013, regarding chronic neck and back pain (Tr. 511, 512). These notes were also generally illegible.

Pierce again visited an ER on June 5, 2014 with complaints of chest pain. She was diagnosed with recurrent atypical chest pain, palpitations, a murmur and hypertrophic cardiomyopathy (Tr. 450-51). She advised she had experienced intermittent chest pain since 2011 (Tr. 451). The following day, June 6, 2014, Dr. Herbert Ladley performed a cardiac catheterization, left ventriculography and angiography (Tr. 415). He found Pierce had hemodynamic evidence of hypertrophic obstructive cardiomyopathy and mitral leaflet motion associated with mitral regurgitation, but saw no significant coronary artery disease (Tr. 416). Dr. Ladley planned to continue use of a beta-blocker, conduct outpatient monitoring, and examine Pierce a few weeks later (*Id.*). He noted Pierce's palpitation symptoms and "EKG evidence of pre excitation" (*Id.*).

On May 24 and June 16, 2014, Pierce returned to the Coeburn Hospital Clinic complaining

of back pain that extended into her legs.  The notes are generally illegible (Tr. 509).

Pierce followed up with Dr. Ladley on August 5, 2014.  He observed her palpitation loop monitoring in June 2014 was unremarkable, but noted Pierce continued to have chronic atypical chest pain and dyspnea (Tr. 533). She reported pain when trying to mow the lawn or work, being overly tired and that stress caused palpitations (Tr. 530). Dr. Ladley continued her medications and planned to see her in six months (Tr. 503).  He noted she was having trouble working and might seek disability, a step he considered appropriate (*Id*.).

Pierce returned to the Coeburn Hospital Clinic on September 15 and December 15, 2014, and March 17, 2015 complaining of chronic back pain (Tr. 507-08, 515).  These records are rather illegible, but it appears an MRI was ordered in December and disc disease was diagnosed in March 2015 (Tr. 507).

On March 23, 2015, Pierce returned to Dr. Ladley.  While she had occasional atypical chest pain that was sharp, heartburn, feelings of tiredness, and hip pain, he felt her status was about the same (Tr. 522). He noted a heart murmur at grade 2 of 6 upon exam, variable sinus rates, and difficulty discerning which symptoms were related to hypertrophic myopathy (Tr. 525).  Dr. Ladley increased the beta blocker dosage and recommended Pierce not work (Tr. 522, 526).  A follow-up was scheduled for October 2015 (*Id.*)

On April 16, 2015, Pierce established as a patient with nurse practitioner Brooke Gibson (Tr. 719-20).  She reported lumbar pain that radiated into her left leg and was aggravated by sitting and standing, arm pain, rash, and depression (*Id*.).  She showed tenderness in her musculoskeletal exam (Tr. 722). Gibson prescribed a pain medication and referred Pierce for an MRI in order to assist in identifying further treatment options (Tr. 723).  On May 19, 2015, the MRI showed "new" foraminal extrusion, lumbar nerve root compression, an enlarging herniation at L4-5 with mild stenosis, and severe progressive disc and endplate degeneration at L4-S1 with a herniation (*Id*.).  Ms. Gibson added medications, including a narcotic for pain, prescribed a TENS unit. She felt

Pierce's cardiac condition prevented physical therapy (Tr. 562).

Pierce returned to Ms. Gibson in June 2015 due to dizziness, shortness of breath, anemia, back and arm pain and depression (Tr. 553). Pierce advised her pain radiated to her left foot and symptoms were aggravated by standing and sitting. (Tr. 553.) Pain medication provided mild relief. (*Id.*) The musculoskeletal exam was normal; the neurological exam showed normal strength, gait and coordination and no deficits (Tr. 556).

On August 20, 2015, Pierce had initial evaluation with Dr. Paul Jett regarding back pain (Tr. 822). Dr. Jett noted the pain was chronic and worsened over time. Pierce claimed her pain was 7 on a scale of 10, with her worst pain being 10 of 10; her pain was aggravated by "everything" and improved with medication. (Tr. 823). Dr. Jett recorded she experienced stiffness and she only had mild relief from analgesics, heat, muscle relaxants, NSAIDS, and ice. (Tr. 822). He noted Pierce had not seen a chiropractor, physical therapist, or pain specialist, but had received steroid injections (*Id.*). On exam, he found decreased range of motion and tenderness in the lumbar region, but the straight leg test was negative (Tr. 825-26). Her neurologic exam was normal (Tr. 826). Dr. Jett recommended epidural steroid injections, continuance of pain medications and physical therapy. Pierce agreed to the injections but declined PT based upon her heart condition (Tr. 827). The first injection occurred on September 25, 2015 (Tr. 909).

Pierce saw Ms. Gibson on August 12 and September 9, 2015 (Tr. 880). At the August visit, ankle edema was observed. There was no edema or tenderness in the musculoskeletal exam and no abnormalities on the neurological exam in September (Tr. 887)

Pierce returned to Dr. Ladley on October 19, 2015. She reported continued dyspnea and chest pain (Tr. 815). Dr. Ladley felt Pierce was unable to work and completed a disability report (Tr. 815). He noted her symptoms remained limited and she was tolerating her beta blocker (Tr. 820). He continued this medication, planned an appointment a year later and noted his belief that she had an acceptable risk for back surgery with proper management (*Id.*).

Pierce returned to Ms. Gibson four times in late 2015 and early 2016. Her steroid injection did not provide "sustained relief," but it was unrealistic expect to be pain free (Tr. 878). The October and November records indicate Pierce was a candidate for surgery to address lumbar radiculopathy. She did not wish to consult about this option due to her childcare obligations for her disabled grandson whom she adopted (Tr. 870, 878). The visit records reiterate the same general information regarding her conditions as prior records, although the musculoskeletal and neurological exams were normal on these visits (Tr. 838, 846, 850, 857, 876). Pierce was referred to pain management in February 2016 (*Id.*)

At Ms. Gibson's request, Pierce returned to Dr. Jett on March 9, 2016, for an evaluation and medication recommendation. Her back pain worsened since the prior visit and she was experiencing aching, burning and stabbing feelings. She reported an ability to care for herself and walk for exercise, but unable to do house or yard work, shopping and hobbies (Tr. 903). Pierce had decreased range of motion and tenderness in her lumbar back on exam, but no abnormalities were noted following the neurological exam and her gait was normal (Tr. 904). Dr. Jett felt it would be inappropriate to "go up on the short acting [pain] medication," that Pierce should shift to a long acting medication, and she should move away from OxyIR 30 tablets. (Tr. 906). Dr. Jett explained his recommendations and rational along with suggesting other non-medication options, such as physical therapy, due to her heart condition. Pierce became upset, made a vulgar remark and stormed out (*Id.*). Dr. Jett discharged her from his care.

Pierce saw Ms. Gibson on March 29, 2016, due to back pain. The care plan was conservative; she was to alternate ice and heat and continue her medications. The physical exam generated no significant findings (Tr. 911-12).

Pierce had an "initial pain assessment" with Dr. Harland Simpson on June 9, 2016, regarding her back. Dr. Simpson found she could toe stand but had difficulty with balance in the heel stand and her sensation was intact (Tr. 916-17). His treatment plan was medication based.

She returned in July 2016 and the treatment plan remained focused on medication use (Tr. 924). In August 2016, Pierce complained to Dr. Simpson that she had "burning cramping" in her right leg (Tr. 924). She admitted doing home chores, but claimed she was otherwise disabled (*Id*.). In addition to medication, Dr. Simpson recommended daily exercise in September 2016 (Tr. 926).

On October 24, 2016, Pierce underwent an EMG study due to "chronic low back pain that radiates down into both legs into her feet" at the request of Dr. Harland Simpson (Tr. 895). The findings were consistent with right L4-5 radiculopathy and mild left radiculopathy, but there was no evidence of large fiber peripheral neuropathy (Tr. 897). Pierce was stable with adequate pain relief, but had worsening neuropathic pain (*Id*.). He again recommended a medication focused plan in October and November 2016, (Tr. 933, 937), along with smoking cessation and weight reduction (Tr. 937). By December 2016, Pierce continued to have pain and her right leg was giving out. However, Pierce was able to do her activities of daily living (Tr. 938).

In February 2017, Pierce returned for a follow-up with Dr. Simpson. She was having good pain control, looked good on the exam, walked easily and changed positions. Dr. Simpson continued the medication regimen and recommended she join the YMCA (Tr. 941).

## C.     Medical Opinion Reports

### 1.     Treating Physician, Dr. Herbert Ladley

Dr. Ladley prepared an opinion for this matter in October 2015 (Tr. 811-14). He later affirmed the opinion remained applicable as of January 17, 2017 (Tr. 913). Dr. Ladley categorized Pierce's heart condition as Class IV. This class encompasses "[p]atients with cardiac disease resulting in an inability to carry on any physical activity without discomfort. Symptoms of heart failure or the angina syndrome may be present even at rest. If any physical activity is undertaken, discomfort is increased" (Tr. 811). He felt Pierce could lift or carry 5 pounds, but did not identify the applicable frequency level in an eight hour work day (Tr. 811). She could stand or walk 10 to 15 minutes without interruption and sit for one hour due to IHSS, i.e. idiopathic hypertrophic

subaortic stenosis (TR. 812). He opined that Pierce could never climb, stoop, kneel, balance, crouch or crawl (Tr. 813). Dr. Ladley felt Pierce's ability to reach, handle, feel, push and pull were affected by her impairment, but he did elaborate. Similarly, he opined Pierce has environmental restrictions relative to work involving heights, chemicals, fumes, dust, humidity, temperature extremes, noise, vibration and moving machinery, but did not explain how the restrictions affected her activities (Tr. 814). Dr. Ladley did not address whether often Pierce would miss work due to impairments and instead opined that she is unable to work (Tr. 814).

## 2. Treating Physician, Dr. Harland Simpson

On February 17, 2017, Dr. Simpson prepared an opinion based on her cervical and lumbar disease. He first opined Pierce was limited to occasionally carrying 10 pounds in an eight hour day (Tr. 914). He felt she could sit, stand and/or walk for one hour in an eight hour day and 20 to 30 minutes uninterrupted (*Id.*). For postural activities, she could occasionally kneel and stoop, but never climb, crouch, balance or crawl (*Id.*). Pierce could frequently feel, see, hear, and speak and occasionally reach, handle and grip, but never push or pull (Tr. 915). For environmental limitations, Dr. Simpson opined Pierce should frequently avoid heights, moving machinery and vibration and occasionally avoid chemicals, fumes, dust, humidity, temperature extremes and noise (*Id.*). He felt Pierce's impairments would cause her to miss work more than 2 days per month and she was unable to be employed in any consistent activity (*Id.*).

## 3. Treating Nurse Practitioner, Brooke Gibson

Ms. Gibson provided an opinion in June 2015.[2] She felt Pierce could lift and/or carry less than 5 pounds due to her hypertrophic obstructive cardiomyopathy (Tr. 548). She opined Pierce could stand and/or walk and sit 10 to 15 minutes in an 8 hour day without interruption due to her heart and lumbar spine conditions. She opined Pierce could never perform postural activities and

---

[2] Gibson is not an acceptable medical source for purposes of this disability claim. *See* 20 C.F.R. § 414.1520 (a)(7). She is, however, a medical source whose opinions may be considered. *See* 20 C.F.R. §§ 1502(d) & 1527(f).

was impaired in reaching, pushing/pulling and handling (Tr. 549). Gibson gave an environmental restriction relative to working around heights. Finally, Pierce's impairments or treatment would cause her to be absent more than 2 days per month (*Id*.)

### 4.      Disability Examiner for Pierce, Dr. Rebekah Austin

Dr. Rebekah Austin examined Pierce on March 1, 2017. She found moderate tenderness, muscle spasms and limited range of motion in the lumbar spine, but full strength in all areas tested (Tr. 945-46). Dr. Austin diagnosed lumbar degenerative disc disease, chronic lower back pain, hypertrophic obstructive cardiomyopathy, major depression and generalized anxiety (Tr. 947).

In her narrative report, Dr. Austin wrote that Pierce was unable to seek or participate in gainful employment due to pain and immobility caused by her back pain and fatigue from her heart condition (Tr. 947). The back pain was exacerbated with minimal exertion and prevented lifting of more than 8 to 10 pounds. Pierce could stand for 10 to 15 minutes or walk 25 to 30 feet before pain and fatigue required her to rest. Pierce could remain seated for 10 to 15 minutes (Tr. 947).

In a separate form for assessing the ability to do work-related activities, Dr. Austin opined Pierce can occasionally lift 10 to 12 pounds and frequently lift 8 to 10 pounds in a work day (Tr. 948). She felt Pierce was limited to a total of 2 to 3 hours standing and/or walking and 2 to 3 hours sitting in a work day, but could only do any of these without interruption for less than an hour (*Id*.). Pierce could occasionally kneel but never perform other postural activities (*Id*.). She could frequently handle, feel, grip, see, hear and speak, but only occasionally reach, push or pull (Tr. 949). Pierce should frequently avoid heights and moving machinery (*Id*.) Dr. Austin opined Pierce would miss 2 or more days of work per month due to impairments or treatment (*Id*.)

### 5.      SSA Consulting Examiner, Dr. Robert Blaine

On March 25, 2015, Pierce was examined by Dr. Robert Blaine. She alleged back pain, cardiomyopathy, diarrhea, shortness of breath and hypertension (Tr. 518). Pierce had minimal difficulty moving from a chair to the exam table. Based on the cardiovascular exam, Dr. Blaine

noted a grade 5/6 systolic heart murmur which was "harsh and palpable on the chest wall" and that her point of maximal impulse was displaced laterally (Tr. 519). The musculoskeletal exam revealed a range of flexion, rotation, and extension limitations (*Id.*). The neurological exam showed decreased sensation in the left hand and foot, full or nearly full strength in the measured areas, limitations in knee and ankle jerks and pain with straight leg raises (*Id.*). Pierce had poor tandem walk balance, an inability heel walk, and a limited toe walk due to pain. (*Id.*) She could squat halfway to the floor and her single leg stands were normal. (*Id.*). Dr. Blaine diagnosed low back pain secondary to disc disease, hypertrophic cardiomegaly, diarrhea, dyspnea, hypertension and neck and shoulder pain. He assessed that Pierce could stand or walk for 2 hours in a work day with reasonable rest breaks secondary to dyspnea and back pain. She could sit for 8 hours with reasonable rest breaks. She could infrequently lift and carry not more than 15 pounds. (Tr. 520).

### 6. State Agency Reviewer, Dr. Carolyn Parrish

On May 13, 2015, Dr. Parrish completed an RFC assessment. She found Pierce could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk 6 hours in an 8-hour day, sit 6 hours in an 8-hour day. (Tr. 51). Dr. Parrish opined Pierce could frequently perform most posturals with the exception that she could only occasionally climb ropes, ladders and scaffolds (*Id.*). She identified no other limitations, did not find Pierce's alleged severity and functional limitations to be credible or supported by objective evidence and believed the medical source opinions were overly restrictive. (Tr. 52-53).

### 7. State Agency Reviewer, Dr. Karen Sarpolis

On August 25, 2015, Dr. Karen Sarpolis, the reviewer on reconsideration, opined that Pierce could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 4 hours and sit 6 hours in a work day. (Tr. 71). With the exception of finding Pierce could never climb ropes, ladders and scaffolds, Dr. Sarpolis opined she could occasionally perform all posturals (*Id.*). She felt Pierce was limited in reaching overhead with both arms. Lastly, Pierce

should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards. (Tr. 52). In reaching the limitations, Dr. Sarpolis found Pierce's reported symptoms and limitations were not supported by the totality of the evidence and the claimed severity was not completely consistent with objective findings. She described Dr. Blaine's opinion as too restrictive and gave it no weight. (Tr. 73).

## III.   ANALYSIS

The primary issue for review is whether the Commissioner's decision is supported by substantial evidence. Pierce specifically argues that the ALJ failed to properly weigh the opinions of her treating sources. She also urges the state agency reviewer report to which the ALJ assigned great weight is flawed because it was issued without the reviewer having all of her records.

### A.   Weight Accorded to Treating Sources

### 1.   Applicable Authority

An ALJ must adhere to certain standards in assessing evidence relating to a claim for disability benefits, including medical opinions. The applicable regulation explains that "[m]edical opinions are statements from physicians or psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the] physical and mental restrictions. 20 C.F.R. § 404.1527(2).

The "treating source" rule requires the ALJ to give controlling weight to the opinions of treating sources because:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (quoting 20 C.F.R. § 404.1527(d)(2)[3]). An ALJ must give controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)[4]). But, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188 at *2 (July 2, 1996).

"[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96–2p, 1996 WL 374188, at *4. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527…." *Id.; see also Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). These factors include the length, nature and extent of the treatment relationship, exam frequency, opinion supportability and consistency with the whole record, and treating source specialization. *See Wilson,* 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(c)(2).

The Commissioner must "always give good reasons in [the] notice of determination or decision for the weight" afforded to the claimant's treating source opinion. 20 C.F.R. § 404.1527(c)(2). The reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL

---

[3] Now at 20 C.F.R. § 404.1527(c)(2).

[4] Now at 20 C.F.R. § 404.1527(c)(2).

14

374188 at \*5 (July 2, 1996). "[B]lanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and weight of the relevant evidence." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 248 (6th Cir. 2007).

> There are dual purposes behind the procedural requirement of specificity:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."

*Wilson,* 378 F.3d at 544, quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999). It ensures meaningful review of the determination can occur. *Wilson,* 378 F.3d at 544. The requirement also exists to "ensur[e] that each denied claimant receives fair process," and thus, "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinion denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (6th Cir. 2007). In other words, remand will be warranted "even though 'substantial evidence otherwise supports the decision of the Commissioner,' when the ALJ fails to give good reasons for discount the opinion of the claimant's treating physician." *Friend v. Comm'r of Soc. Sec.*, 375 F.App'x 543 551 (6th Cir. 2010)(quoting *Wilson*, 378 F.3d at 543-44).

Violation of the "good reasons" rule may be harmless error if the opinion is "so patently deficient that the Commissioner could not possibly credit it," the Commissioner adopted the treating source opinion and made findings consistent with the opinion, or the opinion met the goal of 20 C.F.R. § 404.1572(c)(2). *Wilson*, 378 F.3d at 547. If the opinion "permits a claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused. *Friend*, 375 F.App'x at 551.

### 2.    Weight Assigned to Dr. Herbert Ladley and Dr. Harland Simpson[5]

Dr. Herbert Ladley is Pierce's treating physician and opined that Pierce could perform less than sedentary exertional lifting.  The ALJ assigned his opinion little weight, finding it "was inconsistent with the claimant's admitted activities and physical examination findings" (Tr. 19). This phrase comprises the entire analysis for the weight assigned to Dr. Ladley's opinion. Earlier in the decision, the ALJ described Pierce's "admitted activities" as providing care for a special needs child and driving a car. In contrast, the ALJ found Pierce not to be credible in describing her "admitted activities."  The ALJ made this judgment because her professed "limited activities" could not be objectively verified and because the ALJ could not attribute the limitations to any particular medical condition as opposed to other reasons.  (Tr. 16).  Thus, the Court is not sure what activities he finds credible that form the basis for discounting Dr. Ladley's opinion.  To be sure, the reasons the ALJ must proffer as a basis to afford less weight to the opinion of a treating source need not be elaborate and can, in fact, be brief.  *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (ALJ's one-sentence rejection of treating physician's opinion, which rejection "reach[ed] several of the factors that an ALJ must consider," satisfied good reasons requirement).  But they must be "good reasons" and sufficient to permit meaningful review.

The ALJ also discounted Dr. Ladley's opinion because it was inconsistent with the "physical examination findings."  (Tr. 19).  But the ALJ does not identify what he means by that. In this case, would those physical examination findings include those made by (1) Dr. Harland Simpson, who found Pierce could perform less than sedentary exertional activity based on his physical examination of Pierce; (2) Ms. Gibson, NP, who after treating Pierce, found she could perform less than sedentary work; (3) Dr. Robert Blaine, who after examining Pierce, opined she could only lift and carry 15 pounds; or (4) Dr. Austin, who opined Pierce could perform less than

---

[5] There is no dispute between the parties regarding Drs. Ladley and Simpson's status as treating sources under 20 C.F.R. 1527(a)(2).

sedentary work?  The ALJ gave little weight to all of these providers, but they all made physical examination findings that would be inconsistent with the reasons the ALJ gave as basis for discounting the treating physician's opinion.  There very well may be good reasons why each of these opinions should be discounted and given little weight.  The problem the Court has is that those reasons are not readily apparent in the ALJ's decision.

The same is true for the ALJ's treatment of Dr. Harland Simpson's opinion.  Dr. Simpson's opinion was assigned little weight for the same reason as Dr. Ladley's opinion was assigned little weight – "it was inconsistent with the claimant's admitted activities and physical examination findings" (*Id.*). The ALJ also placed little weight on Dr. Simpson's opinion because the "opinion was more restrictive than warranted by the claimant's admitted activities" (*Id.*).

The ALJ rejected Drs. Ladley and Simpson's opinions and simply deemed them to be based upon Pierce's subjective complaints, inconsistent with her activities and inconsistent with the evidence of record.  There is no indication he considered the various factors set forth 20 C.F.R. § 404.1572(c).  The absence of discussion of these factors is particularly notable as it relates to the treating physicians specialties.  The regulation provides that the SSA "will generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. 404.1527(c)(2)(5). Dr. Ladley is a cardiologist who performed a surgical procedure that facilitated his diagnosis of Pierce's heart conditions. He continued to treat her thereafter and primarily managed the conditions with medication. Dr. Simpson conducts pain management for Pierce relative to her back conditions.

Both Drs. Ladley and Simpson expressed comparable opinions about Pierce's various limitations and concurred that she would be expected to miss two or more work days per month due to her heart and back impairments or treatment. While the nurse practitioner, Ms. Gibson, is

not an acceptable medical source, she qualifies as a medical source that will be considered under 20 C.F.R. 404.1527(f)(1). Her opinion is similar to those expressed by Drs. Ladley and Simpson. Dr. Austin, a consultant retained by Pierce, provided an opinion similar to those of the treating physicians and nurse practitioner. Dr. Blaine offered an opinion with somewhat less conservative limitations but it was still far more restrictive than state agency reviewer opinions.

The ALJ failed to explain adequately why he discounted these opinions and this failure "hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) (referencing 20 C.F.R. § 404.1527(c)(2)). Therefore, substantial evidence does not support the decision. The Court declines to address the balance of Pierce's arguments in light of the need for a remand.

## IV.    CONCLUSION

Based upon the foregoing, the Court finds that substantial evidence does not exist to support the ALJ's decision. Accordingly, the court RECOMMENDS that Plaintiff's motion for judgment on the pleadings [Doc. 16] be GRANTED and the Commissioner's motion for summary judgment [Doc. 19] be DENIED for the reasons stated herein and the matter remanded pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further proceedings consistent with this Report & Recommendation.[6]

Respectfully Submitted,

---

[6]Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Fed. R. Civ. P. 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

s/ Clifton L. Corker
UNITED STATES MAGISTRATE JUDGE